Filed 7/3/25  P. v. Hadaegh CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>HESAM DEAN HADAEGH,<br><br>      Defendant and Appellant. | B337945<br><br>(Los Angeles County<br>Super. Ct. No. LA096713)<br><br>**REDACTED PUBLIC VERSION**\* |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory A. Dohi, Judge. Affirmed.

Bases & Bases and Arielle Bases for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle, Lauren Sanchez and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

\*      This case involves material from a sealed record. In accordance with California Rules of Court, rules 8.45, 8.46(g)(1) and (2), we have prepared both public (redacted) and sealed (unredacted) versions of this opinion. We order the unredacted version of this opinion sealed.

Defendant Hesam Dean Hadaegh appeals from a final judgment following the denial of his motion for mental health diversion and no contest pleas to misdemeanor stalking (Pen. Code[1], § 646.9, subd. (a)), violating a restraining order (§ 273.6, subd. (a)), and vandalism (§ 594, subd. (a)). Hadaegh contends the trial court erred in denying his request for mental health diversion under section 1001.36. Finding no reversible error, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Hadaegh's no contest pleas stem from his failed relationship with the victim, Lucia W.[2]

Hadaegh and Lucia were law school classmates who began dating after graduation, in the summer of 2020.[3] They split up after about four months because Lucia discovered Hadaegh was addicted to methamphetamines. He had also been emotionally abusive towards her. Nevertheless, Lucia continued to see Hadaegh "on and off" for a few more months. During this time, Hadaegh bounced from threatening her to expressing contrition and promising to change.

His threats were at times dire. In audio text messages, he told her he would punch her in the face until she was dead and make it his life's mission to ruin her financially and professionally. He told her she "deserved the worst kind of torture."

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    To protect her privacy, we refer to the victim by her first name and last initial only. (Cal. Rules of Court, rule 8.90(b)(4).)

[3]    We take these facts from the preliminary hearing transcript and the documents Hadaegh submitted to the trial court in support of his motion for mental health diversion.

Exhausted by the cycle of abuse, Lucia broke things off for good in July 2021. Hadaegh refused to let go. He became obsessed with the ideas—which would later form the basis for his diagnosis of delusional disorder—that Lucia, together with her brother, had his computers, rendering them inaccessible, and engaged in other hacking activities directed towards him. He continued to call Lucia. When she blocked his number, he used "spoofed" phone numbers to trick her into answering his calls or to send her text messages. Some of the messages contained threats and false accusations against her. At one point, he sent her a video of himself holding a gun. Lucia, who knew he owned multiple guns, interpreted this as a threat on her life.

Lucia repeatedly warned Hadaegh she would seek a restraining order if he continued to contact her. Hadaegh failed to heed her warnings. Lucia sought and obtained a civil restraining order in November 2021. The day prior, Hadaegh had claimed Lucia broke into his apartment and destroyed  property . Hadaegh reported the alleged break-in to police but they did not find the report credible. Even as she drove to the courthouse to get the restraining order, Hadaegh chased her in his car, honking and speeding to catch up with her.

Hadaegh was served with the restraining order on December 1, 2021. He did not comply with the order. Less than a week after it was served, police notified Lucia that he had placed a tracking device on her car. This helped to explain why she frequently noticed Hadaegh's red Jeep with a distinctive sticker on its hood or saw Hadaegh himself when she was out—on the freeway, at church, at restaurants, at the farmer's market; in Lucia's words, "he was everywhere."

Even after police removed the tracking device, Hadaegh continued to lurk around Lucia's apartment. She installed

security cameras and noticed he often parked on a side street adjoining her bedroom window. From that vantage point, he would shine lasers through her window in the middle of the night. On two occasions, he shot at the window with a pellet gun. The glass never broke but Lucia discovered a hole beneath the exterior window frame she suspected was caused by Hadaegh's shooting. Lucia also suffered flat tires caused by someone placing objects under her car's wheels while parked that punctured the tires when she drove off; on other occasions, the car's antennas had been cut and its gas tank tampered with.

In February 2022, Lucia spotted a man resembling Hadaegh on her surveillance footage with tools trying to break into her apartment while she was home. On another occasion, Hadaegh smeared feces on her door.

Hadaegh also continued contacting Lucia by e-mail, phone, and text. He called her at all hours, interfering with her sleep. He relentlessly demanded she withdraw the restraining order, complaining it was interfering with his efforts to be admitted to the Washington, D.C. bar. His language was threatening. For example: " 'Know you want to go report me to the cops, Lucia. I F-ing dare you to let me go to jail one more time and get out with the rage I had the first time plus some.[4] Let that happen. Let it happen because I already know I'm not going to give a F about life. I'm not going to give a F about life when I walk out that jail. Let it happen. Let it happen so I can go walk out of jail again at midnight, walk all the way from Van Nuys, all the way to North

---

**4**     It is not clear from the parties' briefs or the record when Hadaegh went to jail "the first time," as described in this February 2022 text message. The only period of incarceration the parties discuss is from April 2022 to October 2022.

Hollywood where my car was[,] not having S or eat[en] in days. [¶] . . . It's going to be a F-ing hot night.' " He later continued, " 'I'm going to be the worst memory of your life. Fix the F-ing restraining order tomorrow, otherwise, you're going to see me every F-ing day one way or another.' "

In February 2022, Hadaegh started harassing a male acquaintance of Lucia's. Hadaegh accused him, too, of hacking Hadaegh's computers, and threatened to cause him harm as well. In a message to Lucia, Hadaegh mused, " 'Do I kill you both or just have him or just put you both behind bars. None of these satisfy me.' "

In March 2022, another tracking device was found on Lucia's car. Surveillance footage from a restaurant she was eating at showed a man Lucia believed to be Hadaegh (based on various characteristics, including the Jeep he arrived in) tampering with her car.

In April 2022, Hadaegh sent Lucia a photograph depicting a dead body on the floor of his kitchen with a bracelet she had given him. He followed up with a text message: " 'I don't think you know you're doomed. You are the most wicked person I've ever seen and you don't even think you're back and look at your partner. That son of a B is more evil than you and his head will be dipped in wax and brought before my feet.' " Later that day, police arrested Hadaegh on the street adjoining Lucia's bedroom window. In his Jeep parked nearby, they found a two-foot machete, a paint gun, a pellet gun, and a laser pointer.

Two days later, Hadaegh was served with a criminal protective order prohibiting him from contacting Lucia. He violated this protective order, too, by continuing to contact Lucia by phone and text.

Following his arrest, Hadaegh spent six months in state custody.

Hadaegh was released from jail in late October 2022. From the time of this release to the date of the determination of the motion that is the subject of this appeal, Hadaegh was free on bond and did not violate any restraining orders.

About a week later

Immediately upon the conclusion .

Beginning in  Pacific Neuroscience Institute.

In July 2023, Hadaegh filed a motion for pretrial mental health diversion pursuant to section 1001.36. The motion was supported by a report by Dr. Emin Gharibian, a  psychologist diagnosed Hadaegh with delusional disorder, persecutory type .

Dr. Gharibian's discussion supporting his conclusions was much more equivocal than the conclusions themselves.

Regarding Hadaegh's amenability to treatment (§ 1001.36, subd. (c)(1))

Second, Dr. Gharibian reported delusional disorders are oftentimes intractable: "Delusional disorders are very difficult to treat since they involve fixed and ingrained beliefs that continue to persist despite evidence to the contrary.  But he tempered expectations of what such treatment could reasonably be expected to accomplish

Regarding the risk Hadaegh would pose if treated in the community (§ 1001.36, subd. (c)(4))

The People opposed Hadaegh's motion. After the motion was filed, the trial court requested additional information from the defense during a July 2023 hearing, asking whether Hadaegh has "delusions that he'll never surrender" and, "[i]f so, [whether this means] there's a continued risk if [the court] were to grant

6

mental health diversion." The court also solicited Lucia's views on the motion.

In September 2023, the defense had still not provided the trial court with answers to the questions it asked in July 2023. The court delayed resolution of the motion another two months to allow the defense to respond.

At the next hearing, at the end of October 2023, the defense still had not managed to answer the trial court's questions. It assured the court that answers would be forthcoming from a psychiatric care provider called Mindpath Health, but that Mindpath was still in the process of evaluating Hadaegh. The court continued the matter for another month.

The day before that hearing, the defense offered a series of reports from Mindpath Health. These reports are not opinions. Instead, they  They did not provide direct answers to the questions the trial court posed in July 2023, i.e., whether Hadaegh has "delusions that he'll never surrender" and, "[i]f so, [whether this means] there's a continued risk if [the court] were to grant mental health diversion."

The first report,

The second report,

The third report,

The fourth report,

The fifth and final report before the trial court ruled on Hadaegh's motion concerned a session on November 22, 2023. In the report, the words "ruling out" appear after the words  and "Status of prior diagnosis Delusional disorder persecutory type." At the November 30, 2023 hearing, the trial court inquired with defense counsel about the meaning of these words. Counsel agreed they "[did]n't make sense in conjunction with the narrative, which shows that he has these disorders . . . ."

7

The trial court denied Hadaegh's motion, concluding he was unsuitable for diversion. It was not satisfied the evidence showed the symptoms of Hadaegh's mental disorder contributing to his criminal behavior would respond to mental health treatment (§ 1001.36, subd. (c)(1)) or that, if treated in the community, he would not pose an unreasonable risk of danger to public safety, as defined in section 1170.18 (§ 1001.36, subd. (c)(4)).

Hadaegh thereafter pled no contest to three misdemeanors, again: violation of section 646.9, subdivision (a) (stalking); violation of section 273.6, subdivision (a) (violating a restraining order); and violation of section 594, subdivision (a) (vandalism). The trial court sentenced Hadaegh to three years' probation, including conditions for therapy, sobriety and domestic violence training, and issued a 10-year protective order in favor of Lucia.

Upon a certificate of probable cause, Hadaegh timely appealed denial of his motion for pretrial mental health diversion. (§ 1237, subd. (b); Cal. Rules of Court, rule 8.308(a).)

## DISCUSSION

### I.  Applicable Law and Standard of Review

"In 2018, the Legislature enacted sections 1001.35 and 1001.36 to create a pretrial diversion program for defendants with certain mental health disorders. [Citation.] Pretrial diversion 'allows for the suspension of criminal proceedings and potential dismissal of charges upon successful completion of mental health treatment.' [Citation.] The statute expressly promotes '[i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety.' " (*Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 133 (*Vaughn*).)

To qualify for diversion, a defendant bears the burden of making a prima facie case that (i) he is "eligible" for diversion;

8

and (ii) he, and the charged offense, are "suitable" for diversion. (§ 1001.36, subd. (e).)

Section 1001.36, subdivision (b) sets forth the two requirements for eligibility: that (1) the defendant has been diagnosed with a qualifying mental disorder; and (2) the qualifying mental disorder "was a significant factor in the commission of the charged offense." (*Ibid.*)

Suitable offenses are any not listed in section 1001.36, subdivision (d).

A defendant is suitable for diversion if he satisfies the four criteria set forth in section 1001.36, subdivision (c). As it is undisputed that Hadaegh satisfied two of these—he consented to diversion and waived his right to a speedy trial (*id.*, subd. (c)(2)); and agreed to comply with treatment (*id.*, subd. (c)(3))—we are concerned here only with two: first, whether "[i]n the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment" (*id.*, subd. (c)(1)); and second, whether "[t]he defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community" (§ 1001.36, subd. (c)(4)).

The statute also gives the trial court discretion to deny diversion even if the statutory requirements are met. (See § 1001.36, subd. (a).) However, such discretion must be " 'consistent with the principles and purpose of the governing law' " (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 891) and the court's statement of reasons for denying diversion " 'should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals' " (*Vaughn*, *supra*, 105 Cal.App.5th at p. 135).

We review a trial court's ruling on a motion for mental health diversion for abuse of discretion, and its related factual findings for substantial evidence. (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147.) "A trial court has 'broad discretion to determine whether a given defendant is a good candidate for mental health diversion.' " (*Ibid.*) "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence." (*People v. Moine* (2021) 62 Cal.App.5th 440, 449.)

## II.    Analysis

As the suitability factors are conjunctive, we may affirm if the trial court did not err in its conclusion as to either disputed factor. (See *People v. Watts* (2022) 79 Cal.App.5th 830, 837.) For the reasons that follow, we find no error in the trial court's conclusion that Hadaegh failed to show the symptoms of his delusional disorder would respond to treatment. We need not consider whether the court erred in finding Hadaegh would pose an unreasonable risk if treated in the community as any such error would necessarily be harmless. (See *ibid.*)

### A.    The Trial Court Did Not Err in Finding Hadaegh Failed to Make a Prima Facie Case of Suitability Under Section 1001.36, Subdivision (c)(4)

That Hadaegh lacked an opinion of a qualified mental health expert that the symptoms of his mental disorder would respond to treatment is a factual finding reviewable only for substantial evidence. This is because the question "involves evaluating expert testimony and making conclusions based thereon." (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1079.)

As the trial court determined there was a failure of proof on Hadaegh's part, our deferential review permits us to find error only if the evidence compels a finding in his favor as a matter of law. (*Roesch v. De Mota* (1944) 24 Cal.2d 563, 570–571.) Such a finding is compelled only if Hadaegh's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." (*Id.* at p. 571.)

Dr. Gharibian opined, tracking the language of section 1001.36, subdivision (c)(1),  But the trial court properly looked beyond this conclusion to evaluate the substance of Dr. Gharibian's assessment of Hadaegh's disorder. "The value of an expert's testimony depends on the material upon which the opinion is based and the reasoning used to form that opinion [citations], and a trial court is not obligated to accept even unanimous or uncontradicted expert opinion. [Citations.] The trial court may reject completely the testimony of an expert witness, as long as its decision to do so is not arbitrary." (*People v. McCoy* (1995) 40 Cal.App.4th 778, 785.)

As noted above, Dr. Gharibian diagnosed Hadaegh with both delusional disorder . Hadaegh argues the trial court failed to address his "other [mental health] disorders" . However, the question in considering eligibility for mental health diversion is not whether *any* disorder a defendant may have would respond to treatment but whether the symptoms of "*the* mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment." (§ 1001.36, subd.  (c)(1), italics added.)

The trial court interpreted Dr. Gharibian's report as identifying delusional disorder as the only disorder significantly

11

factoring into Hadaegh's criminality. This interpretation is not arbitrary. Dr. Gharibian . It was these beliefs which Dr. Gharibian  Dr. Gharibian expressly noted . Indeed,

In contrast, Dr. Gharibian . Short of offering an opinion that they factored into Hadaegh's criminality,

Hadaegh directs us to no opinion from a qualifying mental health expert that  or bipolar disorder significantly contributed to his commission of the charged offenses. Indeed, Dr. Gharibian, the only expert who offered an opinion for purposes of section 1001.36 eligibility,  Therefore, the trial court did not need to address the other disorders or improvements in the symptoms of those disorders reported by other psychiatrists, psychologists, therapists or case managers.

Dr. Gharibian's ultimate conclusion notwithstanding, he was not optimistic about the prospects for treating the symptoms of Hadaegh's delusional disorder.  But elsewhere in Dr. Gharibian's report, he noted there had been "no change in [Hadaegh's] symptoms, even with medications . . . ."

Hadaegh urges us to find the trial court erred in overlooking progress Dr. Gharibian  But  does not necessarily show improvement from treatment. And , such as when the restraining order his behavior had earned him interfered with his efforts to be admitted to the Washington, D.C. bar.

Following a preliminary review of Dr. Gharibian's opinion, the trial court asked the defense to provide answers to two questions it felt Dr. Gharibian did not adequately address: whether Hadaegh has "delusions that he'll never surrender" and, "[i]f so, [whether this means] there's a continued risk if [the court] were to grant mental health diversion." The defense promised answers, and ultimately had four months to provide them. What they finally provided—the Mindpath reports—not

only validated Dr. Gharibian's pessimism about Hadaegh's prospects for recovery from his delusional disorder, but also cast doubt on other aspects of Dr. Gharibian's analysis.

The Mindpath reports showed Hadaegh still harbored his paranoid delusions about Lucia. He admitted  The reports

Based on the foregoing, we conclude the trial court did not act arbitrarily in rejecting Dr. Gharibian's opinion that Hadaegh's mental disorder would respond to treatment. Dr. Gharibian's opinion itself called that conclusion into question and the Mindpath  notes cast further doubt upon it. By the time the court denied his request for diversion, Hadaegh had undergone extensive mental health treatment and been seen by numerous professionals but the delusions that animated his criminality were unchanged. (Cf. *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 894 ["On this record, where her mental health disorders were never treated comprehensively, there is insufficient evidence to support the trial court's conclusion that Sarmiento's symptoms would not respond to treatment."].) Indeed, despite all of the professional help, a definitive diagnosis remained elusive. These circumstances do not compel a conclusion that Hadaegh's symptoms of the mental disorder his proffered expert identified as causing, contributing to, or motivating the criminal behavior would respond to mental health treatment. (§ 1001.36, subd. (c)(1).)

### DISPOSITION

The judgment is affirmed.

RICHARDSON, J.

WE CONCUR:

13

ASHMANN-GERST, Acting P. J.

CHAVEZ, J.